IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


LARRY ENGLE,                          :

    Plaintiff,                        :
                                         Case No. 3:07cv422

        vs.                               :
                                           JUDGE WALTER HERBERT RICE

BEARINGPOINT, INC.,                   :

    Defendant.                        :


---

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (DOC. #22); JUDGMENT TO BE ENTERED IN
FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION
ENTRY

---

Plaintiff Larry Engle ("Plaintiff" or "Engle") worked in the Dayton office of

Defendant BearingPoint, Inc. ("BearingPoint" or "Defendant"), a management and

technology consulting firm, from January 1, 2006, until his termination on July 6,

2007. Doc. #11 (Am. Compl.) ¶¶ 8-9. In September 2006, Engle was diagnosed

with Primary Lateral Sclerosis ("PLS"), a degenerative neuromuscular disease that,

among other things, affects the pace and tone of one's speech. Id. at ¶ 12. Engle

brings suit against BearingPoint, alleging that it took work away from him,

terminated his employment and refused to rehire him in violation of the Americans

with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"), and Chapter 4112 of

the Ohio Revised Code, because it "regarded him as" disabled. Id. at ¶¶ 19, 21 and 26.

BearingPoint moves for summary judgment on both of Engle's claims, arguing that Engle cannot establish a prima facie case of discrimination. Doc. #22. BearingPoint further argues that even if Engle does establish a prima facie case, he has not set forth sufficient evidence to show that BearingPoint's legitimate nondiscriminatory reason for terminating him is pretext for discrimination. Id. After a review of the facts, the Court will consider the merits of BearingPoint's motion.

I.     FACTS[1]

While employed by BearingPoint, Engle worked in the capacity of a "consultant" on a project with the United States Air Force ("the project"). Doc. #23, Attach. #3 (Perkey Dep.) at 47. The purpose of the project was to identify, document and access Air Force processes, and to determine compliance with certain regulations. Doc. #23, Attach. #3 (Perkey Dep.) at 81. Consultants on this project were responsible for conveying shortcomings or compliance issues to the Air Force and assisting it with corrective measures. Doc. #23, Attach. #3

---

[1]Since this case comes before the Court on the Defendant's Motion for Summary Judgment, the Court sets forth the facts and circumstances giving rise to it in the manner most favorable to the Plaintiff, as the party against whom the motion is directed. Servo Kinetics, Inc. v. Tokyo Precision Instruments, 475 F.3d 783 (6th Cir. 2007).

(Perkey Dep.) at 81. At all relevant times, Breton Perkey ("Perkey") was Engle's immediate supervisor. Doc. #23, Attach. #3 (Perkey Dep.) at 47. Perkey's supervisor was Jason Fogel. Doc. #23, Attach. #3 (Perkey Dep.) at 24.

### A.    Engle's Work History while Employed at BearingPoint

For various reasons, many different employees moved on and off the project, in and around the time period in question. E.g., Doc. #23, Attach. #3 (Perkey Dep.) at 22, 28, 36, 40. For example, in June 2006, Perkey interviewed and "hired" Cathy Trzaska, a BearingPoint employee who was working on another project that was currently underfunded. Doc. #23, Attach. #9 (Trzaska Dep.) at 9. From the beginning, Perkey made it clear to Trzaska that funding issues would necessitate using fewer people on this project over the ensuing years, as the project neared completion. Doc. #23, Attach. #9 (Trzaska Dep.) at 19.

In July 2006, the Air Force modified its contract regarding the project, giving Perkey's team additional work. Doc. #23, Attach. #3 (Perkey Dep.) at 91. Thus, in the fall of 2006, Perkey hired Chris Lauer, as a management analyst (as opposed to a consultant), as well as David Harris and Alfredo Guiterrez, to assist with the additional project work. Doc. #23, Attach. #3 (Perkey Dep.) at 72, 74, 91.

That fall, Perkey shuffled job assignments between the employees working on the project. Doc. #23, Attach. #1 (Engle Dep.) at 174-78. As part of the shuffle, Perkey gave one of Engle's assignments to Lauer and one to Harris.

3

Doc. #23, Attach. #1 (Engle Dep.) at 175-76; Doc. #23, Attach. #3 (Perkey Dep.) at 95-96. Around this same time, Perkey learned that the government would be unexpectedly withdrawing some of its funding for the project, as of November 2006. Doc. #23, Attach. #3 (Perkey Dep.) at 95-96.

Between the end of 2006 and early April 2007, Engle asked Perkey for additional responsibilities, but was given only piecemeal work. Doc. #25 at 19 (Engle Decl. ¶¶ 2, 4). He was also not invited to assist Lauer with the assignment that had been transitioned between them, although he had been told his assistance would be needed. Doc. #25 at 19 (Engle Decl. ¶ 3). In April 2007, Perkey finally gave Engle a significant assignment. Doc. #25 at 19 (Engle Decl. ¶¶ 2, 4).

By early in 2007, Perkey had determined that he had three or four more employees than he had funding to support, as a result of the changed contract. Doc. #23, Attach. #3 (Perkey Dep.) at 94. He and Fogel conferred to determine which employees should continue working on the project, discussing employees' capabilities, abilities to contribute to the project (to include abilities to develop client relationships) and performance reviews. Doc. #23, Attach. #3 (Perkey Dep.) at 144-45; Doc. #23, Attach. #7 (Fogel Dep.) at 54-55. Ultimately, Perkey decided to remove Engle, Trzaska and Jim Eckhart, and Fogel concurred. Doc. #23, Attach. #3 (Perkey Dep.) at 119 (also noting that another employee had decided to leave on her own); Doc. #23, Attach. #7 (Fogel Dep.) at 84-85. The

4

only reason Perkey gave Engle for his removal was a reduction in force, as required by the contract with the Air Force.[2]  Doc. #23, Attach. #1 (Engle Dep.) at 57.

B.    Engle's Unsuccessful Search for Another Assignment

At BearingPoint, when employees are removed from the projects to which they are assigned, they are placed "on the bench", which means that they are still employed but not currently billable.  Doc. #25 at 21 (Email from Perkey to Engle, dtd. May 3, 2007).  Once on the bench, they have a minimum of thirty days to find a new position within the company before they are terminated.  Doc. #25 at 21 (Email from Perkey to Engle, dtd. May 3, 2007).  BearingPoint placed Engle on the bench as of May 15, 2007, and initially informed him that it did not intend to

---

[2]When questioned about why he specifically chose to remove Engle, Perkey testified as follows:

> With regard to Larry, specifically, the things where he came short [were], as I mentioned before, his proactive nature to come up with ideas and drive things to conclusion, just had not been demonstrated in my mind.  And the more I can develop a team of individuals who can act independently and drive things, it's less burden on me in running an engagement.  And then the factor of his lack of relationships that he'd really developed in our client base just was limiting as far as developing more work on the engagement or outside the engagement.

Doc. #23, Attach. #3 (Perkey Dep.) at 146.  When asked whether he and Fogel discussed Engle's medical condition when making the termination decision, Perkey indicated that they did not and that his condition "wasn't part of this decision process."  Id. at 150.

extend his time on the bench beyond the thirty day minimum.[3]  Doc. #25 at 21

(Email from Perkey to Engle, dtd. May 3, 2007).  BearingPoint also placed Trzaska

and Eckhart on the bench, at the same time.  Doc. #23, Attach. #3 (Perkey Dep.)

at 63; Doc. #23, Attach. #9 (Trzaska Dep.) at 23.

According to Fogel (who was Engle's managing director), BearingPoint's

practice has been to work with the employees who are placed on the bench in

order to assist them with finding other chargeable work.

> [W]e work to try to place them, because, you know, we don't want to
> hire people for specific projects, we want to hire people that are going
> to be good consultants or good, you know, good BearingPoint
> employees that can serve us on a number of different opportunities,
> so we try to start placing people.
>
> There's a couple of ways that this happens.  One way is there's online
> postings, internal online postings.  A second way is that we have a
> resource manager, part of our HR function that starts actively kind of
> looking to see if there are openings to place him against.  And then
> the managing director, [these are] their people.
>
> So you try - - as managing director, you try to take care of those
> people.  You try to look on your own engagement and your own
> portfolio, do you have positions they're able to fill, do you have
> positions in the Dayton office that they could fill based on your
> network with the other managing directors or other managers?
>
> And then depending on your network of people and skill sets, like in
> the case of [Engle], I looked outside of our Air Force sector to say:  is
> there somewhere in our defense planning and accounting service
> practice that we could make sure that we find a spot for Larry?

---

[3]However, Engle's time on the bench was eventually extended to 45 days,
as will be more fully discussed herein.

Doc. #23, Attach. #7 (Fogel Dep.) at 91-92. BearingPoint worked with Engle, Trzaska and Eckhart in attempting to secure other billable work, but only Trzaska and Eckhart were successful. Doc. #23, Attach. #3 (Perkey Dep.) at 63-64 (noting that Eckhart moved to a position on the Air Force Business Operations team and that Perkey had asked the lead individual for that team to consider Eckhart for the position; also noting that Engle would have been qualified for the position); Doc. #23, Attach. #7 (Fogel Dep.) at 62-63 (noting that the new hiring director was familiar with Eckhart, because Eckhart had previously done similar work for him); Doc. #23, Attach. #9 (Trzaska Dep.) at 30 (testifying that when looking through a database of job openings, forwarded to her by Perkey, for jobs that fit her skill set, she located, applied for and was hired for a Washington D.C. based project that was under Fogel's senior management).

As to Engle's unsuccessful job search, he applied for 15-16 positions within BearingPoint, but was only contacted about two of them—one in Washington D.C. and one in Columbus, Ohio.[4] Doc. #23, Attach. #1 (Engle Dep.) at 60; Doc. #25 at 20 (Engle Decl. ¶ 7). A member of the BearingPoint Human Resources Department initiated the contact for the Washington D.C. position. Doc. #25 at 22 (Emails from Johnson to Engle, dtd. June 6 & 8, 2007). The project manager for

---

[4]BearingPoint misrepresents the record in stating that "Plaintiff applied for other internal positions with BearingPoint, but did not receive them because he did not meet the requirements for the job." Doc. #22 at 8 n.5. The record cite for this proposition indicates only that Engle was unqualified for one of the jobs he applied for, because he did not hold the requisite master's degree. Doc. #23, Attach. #1 (Engle Dep.) at 80-81.

7

that position asked Engle to have Fogel contact him regarding a recommendation. Doc. #23, Attach. #1 (Engle Dep.) at 40. Although Engle asked Fogel to make the contact, Fogel did not do so and the position was given to another candidate. Doc. #23, Attach. #1 (Engle Dep.) at 40; Doc. #25 at 24 (Emails between Engle and Davis, dtd. June 19, 2007). With regard to the Columbus position, for which BearingPoint made the initial and many follow-up contacts, it turned out that Engle was not qualified for the position, because he did not possess the necessary security clearance. Doc. #23, Attach. #1 at 309-14 (Ex. 18 to Engle Dep.; Emails between Dayton and Columbus Human Resources Depts.); Doc. #23, Attach. #1 (Engle Dep.) at 68.

Other than those stated above, BearingPoint made the following additional efforts to assist Engle in securing a new position:[5] Perkey directed Engle to a contact in the Human Resources Department to assist in his job search; Perkey and Fogel, together, met with Engle three to five times to provide him assistance in his job search; BearingPoint included Engle's resume on three proposals where it sought new work outside the company; Fogel offered to pay Engle's travel expenses from Dayton for a period of time, if he secured the Columbus position;

---

[5]The Court has experienced considerable frustration in checking BearingPoint's cited evidentiary materials. As an example, on just one page of its memorandum in support of its Motion for Summary Judgment, seven of its cites were not supportive of the text that they purported to support. Doc. #22 at 8 (Engle Dep. at 87-88; Fogel Dep. at 92; Fogel Dep. at 90; Perkey Dep. at 167-68 (which was not supportive of the sentence it followed, but was supportive of the sentence preceding it); Fogel Dep. at 93; Fogel Dep. at 94 (although the Court found support for this text on p. 98); Engle Dep. at 80-81 (in footnote 5)).

Fogel extended Engle's time "on the bench" for fifteen additional days while awaiting word on whether any of the submitted proposals that included Engle's resumes would be accepted ("some" were rejected and "some" were still pending, at the end of the extended time period); Fogel made numerous phone calls regarding positions he knew were available.[6] Doc. #23, Attach. #1 (Engle Dep.) at 43-44, 64-65; Doc. #23, Attach. #3 (Perkey Dep.) at 167-68; Doc. #23, Attach. #1 at 309-14 (Ex. 18 to Engle Dep.; Emails between Dayton and Columbus Human Resources Depts.); Doc. #23, Attach. #7 (Fogel Dep.) at 96, 98.

After Engle had been on the bench for 45 days, Fogel terminated him. Doc. #23, Attach. #7 (Fogel Dep.) at 98. Engle was the first employee that Fogel had ever terminated for being unable to find chargeable work while on the bench, although Fogel testified that other people who have been in this position "underst[ood] what's on the radar" and resigned before they were terminated. Doc. #23, Attach. #7 (Fogel Dep.) at 99.


C.    Engle's Performance History

Engle received two performance evaluations while employed at BearingPoint—an interim review, dated July, 2006 (pre-dating his PLS diagnosis), and a year-end review, dated January, 2007 (post-dating his PLS diagnosis). The

---

[6]Engle testified that he had the impression that both Perkey and Fogel wanted to help him find another job within the BearingPoint organization. Doc. #23, Attach. #1 (Engle Dep.) at 42.

9

following summarizes the overall ratings and some of the deficiencies noted by

Perkey, on these evaluations:

- Interim Review

  - Ratings. Received four ratings of "meets expectations" and one of "meets some expectations" on the five rating categories of Personal/Team Development Goals, Managing the Business Goals, Client Management Goals, Business Development Goals and Technical Competence Goals.[7] Received an overall rating of "meets expectations." Doc. #23, Attach. #1 at 278-84 (Ex. 11).

  - Deficiencies and Suggestions. Perkey noted the following performance deficiencies or suggestions:
    - [Engle] has worked to develop new contacts, but has not taken those roles to the level of advisor or one that impacts client direction or satisfaction. [Engle] is comfortable working with various client and government representatives, but has not established a presence on the AFMC/FM floor. [Engle] needs to resolve clearance issues and establish access to client tools and systems in order to participate in this engagement. Id. at 281.
    - [Engle has not] identified any potential new work to pursue. As a potential opportunity in this area, Larry should work to outline tasks and requirements from his previous working environment and identify ways to approach contacts where BearingPoint has potential to support Air Force efforts. Id. at 282.
    - [Engle] currently has minimal skills in the collection, management and analysis of client financial data. He should continue to develop these skills through training and then test these capabilities with pilot efforts. The project has continued need for data analysis capabilities which makes this an area of needed development for [Engle] to better support project tasks. Id.
    - [Engle] has been a positive participant in the engagement and has utilized his skills at times to support the completion of tasks at hand. But he has

---

[7]BearingPoint uses a five-step evaluation scale, with "not meeting expectations" at the bottom and "significantly exceeds expectations" at the top. "Meets expectations" is in the middle of the scale and "meets some expectations" is the second rating from the bottom. See Doc. #22 at 4; Doc. #23, Attach. #1 at 283 (Ex. 11).

also required ongoing direction and[8] demonstrated the ability to take a task and solely be responsible for its completion. [Engle] needs to improve his technical capabilities and work to better understand and develop his perception of project direction so that he can more fully support project tasks. At the present time, [Engle] is not in a position to tackle a lead role with regard to current projected tasks. Expansion into a lead role with oversight of other team members and responsibility for engagement control processes should be put on hold until capabilities increase in his role as a Consultant. Id. at 283.

- Year-End Review:

  - Ratings. Received ratings identical to those noted in interim review above. Doc. #23, Attach. #1 at 285-91 (Ex. 12).

  - Deficiencies and Suggestions.

    - [While Engle] has grown in knowledge and is supportive of project tasks assigned to him, he has not moved beyond the role of project consultant to take the lead on initiatives, develop new project deliverables or create thought leadership. Id. at 287.
    - During 2006 [Engle] did not establish a working presence on the AFMC/FM floor. . . . Clarification of his [security clearance] status and establishing access to base systems will be required in the very near term in order to continue support on this engagement. Lack of access to base systems and a low level of interaction with client has a limiting effect on his ability to support some project objectives. Id. at 288.
    - [Engle] did not achieve his CDFM certification during 2006. During the next year, a training plan should be identified that outlines the specific courses to be taken that would result in a new certification or FM concepts applicable to our work environment. Id. at 289.
    - [Engle] needs to focus on improving his consulting skills and ensure that he resolves issue[s] that will allow him greater access and interaction with client. He should focus on supporting current project tasks as well as work to identify new opportunities to provide value in what is delivered. Id. at 290.

---

[8]The Court has copied this sentence exactly as it appears on the evaluation form, although it appears by the context of the sentence as if the word "not" may have been intended to have been included between the words "and" and "demonstrated".

## D. Engle's Medical Condition

When Perkey interviewed Engle for the job, he was "aware of a little bit of a speech issue." Doc. #23, Attach. #3 (Perkey Dep.) at 111. By the summer of 2006, Engle began conveying to Perkey that he was having difficulty walking and speaking and that he was having medical tests performed to try to ascertain the cause of his problems. Doc. #23, Attach. #3 (Perkey Dep.) at 111. By this time, Perkey began noticing that Engle's speech was "noticeably different from when [he] hired him," but not to the point of impeding his ability to be understood. Doc. #23, Attach. #3 (Perkey Dep.) at 111-12. As to walking, Perkey noticed that Engle was having difficulty walking and was a "little stiffer". Id. at 112. Engle also informed Perkey that he had fallen on occasion at home. Id. at 112-13.

Engle's doctors diagnosed him with PLS in September 2006 and he immediately told Perkey. Doc. #23, Attach. #1 (Engle Dep.) at 23; Doc. #23, Attach. #3 (Perkey Dep.) at 113. At some point in time, Engle shared with Perkey that his condition "would eventually, gradually get worse and he would lose . . . his mobility and ability to speak." Doc. #23, Attach. #3 (Perkey Dep.) at 115.

At deposition, when asked what problems he foresaw, if any, in Engle's ability to perform his job with his condition, Perkey responded as follows:

None, really. I mean, actually, I thought that he was probably fairly well situated.

I mean, our client is one that is very accommodating to people with disabilities. There [are] lots of folks over on base who struggle with all kinds of things. And it's just a very accommodating environment.

> <u>And in the time that I had been there, I had no concept of anything</u>
> <u>that it would - - it was limiting him while he was employed.</u>
>
> <u>Certainly, at some point in time in the future, it could get to the point</u>
> <u>where he wouldn't be able to speak and interact with people, which</u>
> <u>certainly would have been a difficulty in a job as a consultant</u>, but that
> was something for the future.
>
> <u>It was not a consideration as far as what I felt we were dealing with</u>
> <u>at the time.</u>

Id. at 116-17 (emphasis added).

When asked about the decision-making process that led to the identification

of the three individuals who were placed "on the bench," Perkey was questioned

about whether he and Fogel discussed Engle's physical condition as part of that

process. Perkey responded "no", and then volunteered the following additional

information:

> I was concerned that - - I knew that we didn't have a lot of positions
> [open] within Dayton. And I assumed that whatever opportunity we
> might have for [Engle] and [Trzaska], both of them would be outside
> the area and that would involve travel. And, I mean, <u>I was concerned</u>
> <u>as far as whether Larry could - - he would physically be able to handle</u>
> <u>that</u>, but he made every indication to me when we talked about it that
> he would go wherever. . . . But, yeah, it was a concern of mine.

Id. at 150-51 (emphasis added).

## II. STANDARDS GOVERNING MOTIONS FOR SUMMARY JUDGMENT

Summary judgment must be entered "against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's

13

case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp.</u>

<u>v. Catrett</u>, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). The moving party

> always bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions on
> file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

<u>Id</u>. at 323; <u>see also</u> <u>Boretti v. Wiscomb</u>, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must

present evidence that creates a genuine issue of material fact making it necessary

to resolve the difference at trial." <u>Talley v. Bravo Pitino Rest., Ltd.</u>, 61 F.3d 1241,

1245 (6th Cir. 1995); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250,

106 S. Ct. 2505 (1986). Once the burden of production has so shifted, the party

opposing summary judgment cannot rest on its pleadings or merely reassert its

previous allegations, it is not sufficient to "simply show that there is some

metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith</u>

<u>Radio Corp.</u>, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). Rule 56(e) "requires

the nonmoving party to go beyond the [unverified] pleadings" and present some

type of evidentiary material in support of its position. <u>Celotex</u>, 477 U.S. at 324.

"The plaintiff must present more than a scintilla of evidence in support of his

position; the evidence must be such that a jury could reasonably find for the

plaintiff." <u>Mich. Prot. & Advocacy Serv., Inc. v. Babin</u>, 18 F.3d 337, 341 (6th Cir.

1994).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment shall be denied "[i]f there are . . . 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. Anderson, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure Civil 3d § 2726 (1998).

In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990); see also L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n.7 (5th Cir. 1992), cert. denied, 506

15

U.S. 832 (1992) ("Rule 56 does not impose upon the district court a duty to sift

through the record in search of evidence to support a party's opposition to

summary judgment . . . ."). Thus, a court is entitled to rely, in determining

whether a genuine issue of material fact exists on a particular issue, only upon

those portions of the verified pleadings, depositions, answers to interrogatories and

admissions on file, together with any affidavits submitted, specifically called to its

attention by the parties.


III. ANALYSIS

In his Amended Complaint (Doc. #11), Engle claims that he was

discriminated against by removing his chargeable work, discharging him and

refusing to rehire him to positions for which he had subsequently applied. The

Defendant seeks summary judgment on all those claims. As a means of analysis,

the Court will initially set forth the standards

In Daugherty v. Sajar Plastics, Inc., 544 F.3d 696 (6th Cir. 2008), the Sixth

Circuit recently restated the legal standards which must be applied to assess a

claim of discrimination under the ADA:

> The ADA prohibits discrimination by a covered entity "against a
> qualified individual with a disability because of the disability of such
> individual in regard to job application procedures, the hiring, advancement, or
> discharge of employees, employee compensation job training, and other
> terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A
> prima facie case of disability discrimination under the ADA requires that a
> plaintiff show: "1) he or she is disabled; 2) otherwise qualified for the
> position, with or without reasonable accommodation; 3) suffered an adverse
> employment decision; 4) the employer knew or had reason to know of the

plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." Macy v. Hopkins County Sch. Bd. of Educ., 484 F.3d 357, 365 (6th Cir. 2007) (internal citation and quotation marks omitted).

Where a plaintiff, like Daugherty, seeks to establish a prima facie case by means of circumstantial evidence, we apply the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. at 364. The plaintiff's burden at the summary judgment stage "is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." Id. There are "various context-dependent ways by which plaintiffs may establish a prima facie case, and not rigid requirements that all plaintiffs with similar claims must meet regardless of context." Id. at 365 (emphasis omitted).

It is well settled that not every physical or mental impairment constitutes a disability under the specific parameters of the ADA. Toyota Motor Mfg., Ky. v. Williams, 534 U.S. 184, 195 (2002); Bryson v. Regis Corp., 498 F.3d 561, 575 (6th Cir. 2007). The ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). See also Ohio Rev. Code § 4112.01(A)(13). "If [an employee's] condition does not meet one of these categories even if he was terminated because of some medical condition, he is not disabled within the meaning of the Act. The ADA is not a general protection for medically afflicted persons." Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005).

Id. at 702-03 (footnote omitted). In Talley v. Family Dollar Stores of Ohio, Inc., 542 F.3d 1099 (6th Cir. 2008), the court explained the burdens that flow from a conclusion that the evidence raises a genuine issue of material fact on the elements of his prima facie case:

> Once a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its actions. Gribcheck v. Runyon, 245 F.3d 547, 550 (6th Cir.2001) (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). If the defendant can satisfy its burden, the plaintiff must show by a preponderance of the evidence that the proffered explanation is a pretext for discrimination. Id.

Id. at 1105.

As to Plaintiff's claim under Chapter 4112, the Ohio Supreme Court has found that, since the "federal Americans with Disabilities Act (ADA) is similar to the Ohio handicap discrimination law[,] ... [w]e can look to regulations and cases interpreting the federal Act for guidance in our interpretation of Ohio law." City of Columbus Civ. Serv. Comm'n v. McGlone, 82 Ohio St.3d 569, 573, 697 N.E.2d 204, 206-07 (1998). Therefore, this Court will apply the federal standards applicable to Plaintiff's claim under the ADA, when resolving his claim under Chapter 4112. Accord, Talley, 542 F.3d at 1104-05 n. 3; Wysong v. Dow Chemical Co., 503 F.3d 441, 450 (6th Cir. 2007). In other words, resolution of the Defendant's motion as it relates to Plaintiff's claim under the ADA will also resolve his state law claim. Daugherty, 544 F.3d at 702; Hedrick v. Western Reserve Care Sys., 355 F.3d 444, 452 n. 4 (6th Cir. 2004).

Initially, Defendant argues that the evidence fails to raise a genuine issue of material fact as to whether Engle was disabled, the first element of his prima facie case of disability discrimination. As is indicated above, the ADA defines "disability" as, "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C).[9] Herein, Plaintiff has not alleged in his Amended Complaint

[9]The term "disability" is defined in much the same manner by the Ohio Revised Code. See Ohio Rev. Code § 4112.01(A)(13).

that he had "a physical or mental impairment that substantially limits one or more of the major life activities of such an individual [or] a record of such impairment." Rather, he asserts that Defendant terminated his employment, "because it regarded him as disabled." Doc. #11 at ¶ 21. See also, Id. at ¶¶ 19 and 26. Moreover, in his Memorandum in Opposition to the Defendant's Motion for Summary Judgment ("Memo in Opp."), Plaintiff argues that he can establish this element of a prima facie case of disability discrimination, because Defendant regarded him as disabled. Doc. #25 at 9. Therein, in support of that proposition, Engle points to the following portion of Perkey's deposition testimony:[10]

> Q. Now, once he told you that this would lead to a deterioration of his speaking ability, what problems, if any, did you foresee for him on the job with that?
> A. None, really. I mean, actually, I thought that he was probably fairly well situated.
> I mean, our client is one that is very accommodating to people with disabilities. There's lots of folks over on base who struggle with all kinds of things. And it's just a very accommodating environment. And in the time that I had been there, I had no concept of anything that it would—it was limiting him while he was employed.
> Certainly, at some point in time in the future, it could get to the point where he wouldn't be able to speak and interact with people, which certainly would have been a difficulty in a job as a consultant, but that was something for the future. It was not a consideration.

Perkey Dep. at 116-17. In particular, Plaintiff argues that the final paragraph from Perkey's testimony demonstrates that the Defendant regarded him as disabled. An examination of Perkey's deposition testimony reveals that he was testifying about

---

[10]See Doc. #25 at 10 and 11.

something that could occur in the <u>future</u>, i.e., "the point where" Engle would no longer be able to speak and interact with people.

As relevant to this litigation, the ADA defines disability, as "(C) being regarded as having [a physical or mental impairment that substantially limits one or more of the major life activities of such an individual]." § 12102(2)(C). Given that the Plaintiff relies upon a statement by Perkey about what could occur in the future, the question becomes whether a plaintiff can establish that he is disabled, by demonstrating that his employer may regard in the future that he will have "a physical or mental impairment that substantially limits one or more of the major life activities of such an individual." To state the question is to answer it in the negative. Congress chose to write § 12102(2)(C) in the present tense ("being regarded as having"). If this Court were to hold that the statute is applicable to events that will occur in the future ("being regarded as having or will regard in the future as having"), it would be required to rewrite the language chosen by Congress when it enacted the ADA. It is, however, axiomatic that federal courts are without the power to amend statutes in the guise of statutory construction; rather, that power rests with the legislative branch. <u>United States v. Oakland Buyers' Co-op</u>, 532 U.S. 483, 494-95 n. 7 (2001) (holding that "federal courts interpret, rather than author, the federal criminal code, we are not at liberty to rewrite it"); <u>Baker v. Sunny Chevrolet, Inc.</u>, 349 F.3d 862, 873 (6th Cir. 2003) (rejecting plaintiffs' proposed reading of a statute, because they were requesting the court to "rewrite rather than [to] interpret [the statute]").

20

Moreover, although no court has addressed the issue of whether § 12102(2)(C) applies to what an employer may regard in the future, the Seventh Circuit has held that § 12102(2)(A) does not apply to future physical or mental impairments that will substantially limit one or more of the major life activities. Larimer v. International Business Machines, 370 F.3d 698 (7th Cir. 2004). Therein, Larimer alleged, inter alia, that he had been discharged in violation of the ADA, because his wife had given birth to premature, twin daughters who suffered from a number of serious medical conditions, resulting in their hospitalization for a period of two months after their birth. However, the plaintiff was discharged after his daughters had come home from the hospital, when they were healthy. The Seventh Circuit rejected the argument that future disability would support a claim under the ADA, writing:

> Larimer was fired in August of 2001, shortly after the children came home from the hospital. His principal claim is that IBM violated the Americans with Disabilities Act, by firing him because his daughters are disabled. Are they? They seem fine at present, and so the question, left open in Goldman v. Standard Ins. Co., 341 F.3d 1023, 1026 and n. 2 (9th Cir. 2003), and not elsewhere answered definitively, is whether a possible, or even probable, future disability can ever be a disability that triggers the protections of the Act. 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.8; Den Hartog v. Wasatch Academy, 129 F.3d 1076, 1081-82 (10th Cir. 1997); Tyndall v. National Education Centers, Inc., 31 F.3d 209, 214 (4th Cir. 1994). The Supreme Court's decision in Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83 (1999), suggests (in dictum-the question before the Court was whether a person who has to wear glasses is disabled because without them he couldn't see) that the answer is "no" unless the individual is mistakenly regarded by his employer as [presently] having a disability; such a mistake is an alternative trigger of the Act's protections. 42 U.S.C. § 12102(2)(C); EEOC v. Rockwell Int'l Corp., 243 F.3d 1012, 1014-15 (7th Cir. 2001).

<u>Id</u>. at 699-700.

IV.  CONCLUSION

In sum, the Court has interpreted § 12102(2)(C) as not applying to what an employer may regard in the future.  Therefore, given that the Plaintiff relies upon Perkey's deposition testimony about what would happen in the future, this Court concludes that the evidence fails to raise a genuine issue of material fact as to whether the Plaintiff was disabled, the first element of his prima facie case of disability discrimination.[11]  Accordingly, the Court sustains the Defendant's Motion for Summary Judgment (Doc. #22).  Judgment is to be entered in favor of Defendant and against Plaintiff.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

December 29, 2008

_____
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.

_____

[11]Given that conclusion, it is not necessary to address Defendant's alternative arguments in support of its request for summary judgment.

22